```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                        :    Chapter 11
IN RE WORLDCOM, INC., et al.            :    Case No. 02-13533 (AJG)
                                        :
            Reorganized Debtors.        :
---------------------------------------X
                                        :
INTERNAL REVENUE SERVICE,               :
                                        :    11 Civ. 5463 (KBF)
                     Appellant,         :
                                        :    OPINION & ORDER
             -v-                        :
                                        :
WORLDCOM, INC., et al.,                 :
                                        :
                     Appellees.         :
---------------------------------------X
```

KATHERINE B. FORREST, District Judge.

The United States Internal Revenue Service (the "I.R.S.") appeals from an order of the Bankruptcy Court, In re Worldcom, Inc., 449 B.R. 655 (Bankr. S.D.N.Y. 2011) ("Worldcom III"), which (i) granted Debtors'[1] objection to a proof of claim filed by the I.R.S. relating to unpaid telecommunications excise taxes with respect to the Debtors' purchase of Central Office Based Remote Access ("COBRA") service, and (ii) determined in Debtors' favor a refund motion for approximately $38 million in previously paid excise taxes for the same service.  As the I.R.S. states, "[T]he issue behind both the debtors' objection

---

[1] Due to the history of name changes of the principal debtor in this bankruptcy--i.e., WorldCom Inc., MCI Inc., and currently Verizon Business Global LLC--and the various subsidiary debtors whose actions are at issue in this appeal--principally, UUNet Technologies Inc. and MCI WorldCom Network Services Inc., see Brief of the Appellant ("I.R.S. Br.") at 1 n.1--the Court refers to the various debtors as the "Debtors."

1

to the I.R.S. payment request and their refund motion is the same:  whether the federal communications excise tax applies to COBRA services."  Brief of the Appellant ("I.R.S. Br.") at 7.

The outcome of this appeal depends entirely on whether the COBRA service as purchased by the Debtors constituted a "local telephone service" as defined in 26 U.S.C. § 4252(a).  If it did, then Debtors purchased such a service, are liable for excise taxes claimed, and are not entitled to a refund of taxes previously paid.  If, on the other hand, the COBRA service does not meet the statutory definition, then Debtors are entitled to the refund and owe nothing more.

The determination of whether or not the COBRA service meets the statutory definition is surprisingly complicated on what is now an agreed factual record.  See I.R.S. Br. at 7 n.5 ("The government is not challenging findings of fact in this appeal").  The determinative issue comes down to a judicial finding as to whether, when the undisputed facts are laid against the statutory definition of "local telephone service," they meet or fall short of what Congress intended.  As set forth below, they fall short.  Accordingly, the judgment of the Bankruptcy Court is AFFIRMED.

BACKGROUND

This matter has been between this Court and the Bankruptcy Court for almost five years. The technology underlying this proceeding has been superceded by other ways of accessing the Internet. See, e.g., Worldcom III, 449 B.R. at 658; see also Hr'g Tr. at 66:25-67:20 (Bankr. S.D.N.Y. Feb. 1, 2006) (Testimony of Debtors' Expert, John Anderson). The issue in this appeal does not, therefore, have prospective application to how a "local telephone service" would be defined with respect to today's most utilized technologies for Internet connection.

During the time that this matter has been between the Bankruptcy Court and this Court, there have been a number of opinions that have extensively described the technology at issue and the procedural posture of this case. See, e.g., In re Worldcom, Inc., 371 B.R. 19 (Bankr. S.D.N.Y. 2007) ("Worldcom I"); In re Worldcom, Inc., No. 07 Civ. 7414, 2009 WL 2432370 (S.D.N.Y. Aug. 7, 2009) ("Worldcom II"). The Court assumes familiarity with those opinions.

In WorldCom II, this Court remanded the action to the Bankruptcy Court for two additional findings of fact that would assist it in determining whether the COBRA service met the statutory definition of a "local telephone service." 2009 WL 2432370, at *2. The factual questions this Court posed were: (1) whether the COBRA services purchased by the Debtors afforded "access" to a "local telephone system"; and (2) whether that

3

system as purchased provided for "two-way" or "full-duplex" "telephonic quality communication." Id. at *4.  In connection with those factual issues, this Court identified two factual disputes that needed to be resolved:  (a) the nature and function of the Primary Rate Interface ("PRI") circuits and services in relation to COBRA (and whether these PRI's enabled "access" via a connection to a PBX line); and (b) whether the COBRA service could transmit Voice Over Internet Protocol ("VoIP") communication in a manner that would be considered "telephonic quality communication."  Id.

     Upon remand, on December 13, 2010, the parties submitted Proposed Findings of Fact and Conclusions of Law to the Bankruptcy Court.  On June 15, 2011, the Bankruptcy Court found the COBRA system as purchased by the Debtors did not provide "access" to a local telephone service, but only provided access to high-speed data stream which was not capable of telephonic quality communication.  Worldcom III, 449 B.R. at 659.  As discussed below, the Bankruptcy Court focused on the fact that the Debtors only purchased the output of the COBRA service--that is, the high-speed data stream that emerged from the COBRA system at its "point of egress."  Id.  The Bankruptcy Court also found that the "speed of service that COBRA could maintain would result in communication being garbled and unintelligible when converted from data to voice.  Therefore the COBRA service could

4

not provide telephonic quality communication for computer to computer VoIP." Id. at 660.  The Bankruptcy Court granted the Debtors' motion and the relief requested in Debtors' refund motion.  Id. at 663.  The I.R.S. now appeals that ruling.

Because the I.R.S. is "not "challenging any findings of fact in this appeal," I.R.S. Br. at 7 n.5, this Court's ruling is based upon the facts set forth in the Bankruptcy Court's June 15, 2011 decision.

## DISCUSSION

A. STANDARD OF REVIEW

The standard of review applicable to matters within core bankruptcy jurisdiction is governed by the Federal Rules of Bankruptcy Procedure.  On appeal, the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

While normally a district court would review a bankruptcy judge's findings of fact for clear error, id.; see also Solow v. Kalikow ("In re Kalikow"), 602 F.3d 82, 91 (2d Cir.2010) ("[f]indings of fact are reviewed for clear error"), that is unnecessary here since the I.R.S. has conceded that it is not disputing any factual findings.  See I.R.S. Br. at 7 n.5.

The issue before this Court, therefore, is how application of the undisputed facts measure against a straightforward

reading of the relevant statute and legal principles.  Legal conclusions of the Bankruptcy Court are "reviewed de novo."  In re Kalikow, 602 F.3d at 91.

This Court is also mindful of the principle that "if doubt exists as to the construction of a tax statute, the doubt should be resolved in favor of the taxpayer." Xerox v. United States, 41 F.3d 647, 658 (Fed. Cir. 1994).  But, as in USA Choice Internet Services, LLC v. United States ("USA Choice II"), 522 F.3d 1332 (Fed. Cir. 2008), "'doubts which may arise upon a cursory examination of [the statutory provisions at issue] disappear when they are read, as they must be, with every other material part of the statute, and in the light of their legislative history.'"  Id. at 1343 (quoting White v. United States, 305 U.S. 281, 292 (1938)).

B. LOCAL TELEPHONE SERVICE

The statutory definition of a "local telephone service" comprises a number of interrelated elements relevant to this appeal:  (1) "access" to a "local telephone system," and (2) the "privilege" of "telephonic quality communication" with "substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." 26 U.S.C. § 4252.  On the face of the statute, it is clear that Congress intended to tax what the average person would understand as a local telephone service.  Whether that service

6

was being used for a voice call has been found irrelevant.  See, e.g., USA Choice II, 522 F.3d at 1341.

The two-part statutory definition of "local telephone service" breaks down into the following sub-questions:  what is the meaning of the word "access"?; whether the "privilege" of telephonic quality communication must amount to what could in fact be accomplished with what the Debtors purchased (or, alternatively, whether that "privilege" could be potential or theoretical but not necessarily practically available to the Debtors); whether the service as purchased by the Debtors is capable of "telephonic quality communication"; and, lastly, whether that "telephonic quality communication" can occur with "substantially all persons" who "hav[e] telephone or radio telephone stations constituting the local telephone system." See 26 U.S.C. § 4252; Worldcom III, 449 B.R. at 661.

This Court accepts that as a matter of law, the word "access" as used in 26 U.S.C. § 4252 is synonymous with "connectivity."  USA Choice II, 522 F.3d at 1337; Worldcom II, 2009 WL 2432370, at *3.  The record is clear that the COBRA service derives from, and is dependent upon, the provision of local telephone service that is operated by the local exchange carriers ("LECs").  But that is a different question from whether the COBRA service itself constitutes a "local telephone

7

service" such that Debtors can and should be liable for excise taxes thereon.  See Worldcom III, 449 B.R. at 658.

C. THE COBRA PROCESS

To understand the current dispute, it is useful to emphasize that the COBRA service is only one part of a three-part process that together constitute an Internet access service that ultimately connected end users with dial-up connections to the Internet.  The LECS, the Debtors with their purchase of COBRA service from the LECs, and the Internet Service Providers ("ISPs") all played roles in this Internet service offering that had three distinguishable parts.  The COBRA service that the Debtors purchased was the middle or intermediary piece of the overall Internet service that sat between end users, their LEC, and the ISPs.  See e.g., Worldcom II, 449 B.R. at 658; I.R.S. Br. at 4; App. Br. at 8.

A brief review of the overall Internet service into which COBRA fits assists greatly in crystallizing the key issues.  The starting point, or "step one," for the particular dial-up service was for an end user to use a modem to establish a dial-up connection to his or her LEC's telephone service. Worldcom II, 449 B.R. at 658.  The Debtors had no contractual or physical relationship with the end users, their modems, or the LECs at this stage.  The modem passed the data onto the telephone lines that carried it to the LEC's facilities, I.R.S.

8

Br. at 4--and the Debtors played no role in that passage of data.  The parties do not dispute that at that stage there was a "path" for telephonic quality communication "all the way from the dial up users' modem to [] the NAS."  Worldcom III, 499 B.R. at 658.  The term "path" is apparently used in an attempt to accept the fact that the physical lines that connect the end users' modems into the COBRA system are capable of telephonic quality communication, but to distinguish that "path" leading into COBRA from what occurs within COBRA itself.  See e.g., Worldcom III, 449 B.R. at 658; I.R.S. Br at 5; App. Br. at 10.

    The COBRA service comes into play in the second step of providing the dial-up Internet service:  the data initiated via a modem connection by the end user is passed along a LEC's telephone lines into the LEC's central office or "switch."  Worldcom III, 449 B.R. at 658.  "After passing through the LEC Switch, the data traveled along a PRI line . . . ."  Id.  The COBRA service "starts" when the data crosses the threshold (as it were) into the LEC's central office.  Debtors did not have physical control of the data as it passed into the central office or as it passes along the PRI lines.  Id. at 659.[2]  The data continued along the LECs PRI lines and then passed into and was collected within the LEC's network access server ("NAS").  Id. at 658.  The NAS contained several digital signal process

---

[2] There is no factual claim that the COBRA service starts prior to that time.

9

("DSP") cards that aggregated and converted the data from the type of data that left the dial-up users' modem into TCP/IP packets.  The NAS then transmitted the TCP/IP packets to a high-speed router via a PRI, located within the NAS.  Id.  The NAS essentially transformed the data from low-speed into a high-speed data stream.  Id.

The PRI lines within the LEC central office "can plug into a PBX, which is a switch permitting traditional telephone voice communication.  The service purchased by the debtors did not include a PBX connection to the PRI lines."  Id.  In the absence of a PBX, such as the COBRA service as configured here, there was no possibility of voice telephone communication.  Id.  With the addition of equipment, the PRI lines were therefore theoretically capable of transmitting a telephonic quality communication.  Id. at 659.

D. THE PRIVILEGE OF TELEPHONIC QUALITY COMMUNICATION

The parties expend a great deal of effort arguing whether the "privilege" of telephonic quality communication has been met by virtue of two facts:  (1) the data communication initiated by the modem connection has now traveled along the PRI lines and that communication, to a point, is a "telephonic quality communication" (there is ample evidence in the record to support this); and (2) the PRI lines are capable of "telephonic quality communication" by voice "if" they were connected to a Private

Branch Exchange ("PBX").  See id. at 658-59.  It is undisputed that Debtors did not purchase a service that was connected to any PBX.  Id. at 658; I.R.S. Br. at 5.  The significance of the absence of actual connection to a PBX is hotly contested.

The Bankruptcy Court found that "the Debtors did not have access to any COBRA equipment that would have enabled telephonic quality communication if altered."  World Com III, 449 B.R. at 659.  That finding is taken as dispositive of the ultimate issue of whether the COBRA service met the statutory definition of "local telephone service."  Id. at 661.  The Bankruptcy Court did not find significant the fact that when the data crosses into the central office of the LEC, travels along a PRI line and before it enters the NAS, it is traveling along a "path" that is of telephonic quality.  See I.R.S. Br. at 5.

The premise of the I.R.S.'s argument on appeal is that this finding of the Bankruptcy Court was error.  The I.R.S. has, however, not considered other factors that irrespective of that finding, still result in a judgment for Debtors.  As discussed below, even if this Court accepts that Debtors did purchase a "pathway" consisting of telephonic quality communication, that purchase is not enough to persuade the Court to find that the COBRA service meets all necessary elements of the statutory definition of a "local telephone service."

First, the discussion of whether the theoretical connection to the PBX lines meant that the Debtors had the "privilege" of telephonic quality communication ignores that this Court previously determined that all the Debtors can be responsible for are the services purchased, not potential reconfigurations or capabilities. <u>Worldcom II</u>, 2009 WL 2432370, at *4. That is "law of the case" that this Court sees no compelling reason to alter. That, alone, however, is not necessary to the disposition of this matter.

Second, and key for purposes of this appeal, is that what the Debtors purchased from the LECs was in fact the "NAS output":  a high-speed data stream. <u>See</u> <u>Worldcom III</u>, 449 B.R. at 659. Nothing in the record suggests that the Debtors had any interest whatsoever in purchasing anything short of the high-speed data stream. Only a high-speed data stream would fulfill the Debtors business of providing that stream to ISPs who in turn pass it into the Internet. The parties agree such high-speed data stream emerging from the NAS is not a telephonic quality communication. I.R.S. Br. at 12; App. Br. at 10. Viewed through dissection of the constituent parts of what dial-up users ultimately received, the Debtors have at most a momentary and intermediary participation in the process. The entirety of their participation is derivative of the more direct actions of the ISPs and LECs.

12

In the third and final step of the process, the ISP then connects the now-high-speed data stream to the Internet. The reverse of that process occurs in order for end users to receive information from the Internet. Understood in this way, it is easier to see that what the Debtors are purchasing is a service, or the high-speed data stream output of that service, that is sandwiched in the middle of an overall, three-stage process that enables end user communication with the Internet. See Worldcom III, 449 B.R. at 659; I.R.S. Br. at 3-4 ("Debtors then sold access to that data stream to Internet service providers, which in turn sold internet access to dial up users."). The COBRA service is quite clearly an intermediate service--and not a standalone service--that assists in, but is not independently sufficient for, communication over the Internet.

The fact that the Debtors have only an intermediary role in providing Internet service is a critical distinguishing factor between the COBRA service and the services at issue in the cases the I.R.S. places heavy reliance upon--i.e., USA Choice II and Comcation, Inc. v United States, 78 Fed. Cl. 61 (2007). In both of those cases, the taxpayer was purchasing the entirety of what was needed to connect an end user to the Internet, not just purchasing one piece of a multi-step process.[3] USA Choice II,

---

[3] In USA Choice II, the suit was between the ISP and the I.R.S. The ISP was not playing simply an intermediary role as the Debtors are here.

522 F.3d at 1334; Comcation, Inc., 78 Fed. Cl. at 65.  When the COBRA service is put into proper context, the determinative question of whether this intermediate piece of dial-up Internet service can constitute a stand alone "local telephone service" pursuant to 26 I.R.S. § 4252 takes on new meaning.[4]

E. SHOULD DEBTORS PAY AN EXCISE TAX?

If this Court were to find that the Debtors should pay the excise tax at issue, given the nature of the COBRA service as now described, should the Debtors' responsibility for payment of the excise tax be assessed on the basis of what they purchased--which was the high-speed data stream output of the COBRA service--or should they be taxed on the totality of the COBRA service itself?  That is, were the Debtors buying all of the processing that resulted in the high-speed data stream that came out of the NAS, or were they purchasing only the output itself (and the right to put a high-speed data stream back into the NAS to head in the other direction when the process was reversed)--and does it matter?

The Debtors and the Bankruptcy Court focus on the moment of purchase--that is, the fact that what Debtors purchased is

---

[4] The parties do not articulate the issue in this way or this clearly--instead, they spar over concepts of whether "access" or connectivity to a telephone service occurs, and whether it must occur within the COBRA service to meet the 26 U.S.C. § 4252 definition, see I.R.S. Br. at 14-16; App. Br. at 20-22, and over whether there is ever a telephonic quality communication and if so, whether the necessary portion of COBRA in which the NAS takes in a signal of one speed and spits out a signal of another speed must mean that there was telephonic quality communication, see I.R.S. Br. at 15; App. Br. at 9.

14

available only at the "point of egress" of the COBRA service. See <u>Worldcom III</u>, 449 B.R. at 659; App. Br. at 9.  Essentially, without so stating, the Debtors are arguing that they should be taxed on the output and not how the output came into being.  The I.R.S.'s position assumes--and contends--the opposite:  that the Debtors should be taxed on what has to occur within the COBRA service in order for the high-speed data output to be created in the first place. I.R.S. Br. at 15-16.  The parties' arguments are ships passing in the night.

    The I.R.S.'s focus on the processing that enabled the COBRA service to create a high-speed data stream results in two potential points of "telephonic quality communication."  The first point has really nothing to do with the Debtors--<u>i.e.</u>, when the end user's modem establishes a connection along the LEC's telephone lines in order to get to the LEC's central office where the COBRA service processing begins.  See I.R.S. Br. at 5.  As stated above, the Debtors have nothing to do with that portion of the process.  While that point of the process is a necessary antecedent to what enables the COBRA service to have a signal to process into a high-speed data stream, it is not a service itself purchased by the Debtors.

    The second point of potentially "telephonic quality communication" is when the data that is sent up the LEC's telephone lines crosses the threshold and travels within the

15

LEC's central office.  At that point, the data travels along PRI lines on the way into the NAS.  <u>Worldcom III</u>, 449 B.R. at 659; I.R.S. Br. at 5.  It is still possible that if that line were tapped into with a PBX line, a voice communication could occur.  <u>Worldcom III</u>, 449 B.R. at 659.  There is no dispute that what is travelling along the PRI lines is potentially of telephonic quality, but it is also not disputed that the COBRA service does not have PBX lines.  That issue, however, is of little moment.

    As stated above, it is accepted that until the signal passes into the NAS, there is "telephonic quality communication."  The Bankruptcy Court found that while so called PRI lines could plug into a PBX, which is a switch permitting traditional telephone voice communication, the service purchased by the Debtors did not include a PBX connection to the PRI lines.  <u>Worldcom III</u>, 449 B.R. at 659.  In addition, the Debtors' contracts did not permit them to access the PRI line to reconfigure it to permit traditional telephone voice communication.  <u>Id.</u> at 655, 659, 660.

    The question thus becomes whether the period of time when the LEC takes the data into its central office, passes it along its PRI lines and into the NAS, is enough to transform this intermediate COBRA service into a standalone "local telephone service"?  The answer to that question must be "no."

16

Why that cannot be is easily understood by reference to an example: let us assume that the data that travels into the LEC central office is only on a PRI line for a nanosecond before it enters the NAS and is aggregated and transformed into a high-speed data signal that the parties agree is no longer a telephonic quality communication. Assume that this nanosecond on the PRI lines provides the only theoretical moment of telephonic quality communication within the COBRA service. Is that what Congress meant to tax as a "local telephone service"? Surely not.

But there is another point that becomes clear when the COBRA service is properly understood as an intermediate step in providing an Internet service to end users. Once the data has "crossed the threshold" into the central office, what the COBRA service cannot and does not do, is communicate with "substantially all persons" who are part of "such [asserted] telephone system," as the stature requires. See 26 I.R.S. § 4252. Even if the PRI lines within the COBRA service are taken into account, there is simply no way that as an intermediary sitting between any relationship of the end users and the LECs and ISPs, COBRA provides such far reaching communication capability. The LECs can communicate with substantially all of their customers and vice versa with a telephonic quality communication, but the COBRA service, and end

17

users whose data is traveling independent of them, cannot.  The COBRA service allows for communication with and between the equipment within the LEC's switch and NAS.  The COBRA service's inability to communicate with "substantially all persons" in the telephone system (and vice versa) means that the COBRA service cannot meet the statutory definition of "local telephone service."  See Comcation, Inc., 78 Fed. Cl. at 64 ("the term 'privilege' connotes that the user of such service must have the right to use equipment to communicate with substantially all persons participating in the local telephone system").

   The I.R.S. urges that the fact that the signal travels over the PRI lines (in the Court's example, if only for a nanosecond) means that there is the potential for "substantially all persons" to access those PRI lines.  But that is nonsensical in the context of the COBRA service.  The COBRA service is a self-contained service within the LEC facility.  There is no way for "substantially all persons" within this service to access whatever telephonic quality communication the PRI lines support.  If the COBRA service has "telephonic quality communication" for a nanosecond, then that makes the point even more starkly.  The service that the Debtors purchased is, then, only a service which interfaces with another service (the LEC's actual telephone system) that can and does provide telephonic quality

18

communication to "substantially all persons" in the telephone system.  But that is one step too removed.

The law of statutory construction is clear:  courts should give statutes their plain meaning.  USA Choice II, 522 F.3d at 1336; Hawkins v. United States, 469 F.3d 993, 1000 (Fed. Cir. 2006).  The Court finds, then, that to be a "local telephone service," the service must have the ability to communicate a "telephonic quality communication" to "substantially all persons" using the system.  Here, the merely intermediary service purchased by the Debtors does not.  Indeed, not a single end user could use the COBRA service for real "telephonic quality communication."  Accordingly, the Bankruptcy Court correctly granted Debtors' objection to an IRS request for tax payment and granted Debtors' refund motion.

CONCLUSION

For the foregoing reasons, the Bankruptcy Court's judgment is AFFIRMED.

The appeal is dismissed, and the Clerk of Court shall close this case.

SO ORDERED:

Dated:   New York, New York
         December 22, 2011

*Katherine B. Forrest*

KATHERINE B. FORREST
United States District Judge